## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ZULEMA RENEE BONNER-TURNER, as
Personal Representative for the Estate of
Alphonso Turner, deceased,

       Plaintiff,                 CASE NO. 12-10487
                                       HON. LAWRENCE P. ZATKOFF

v.

CITY OF ECORSE, DIRECTOR OF PUBLIC
SAFETY GERALD CHAMPAGNE, SGT. JAMES
FRIERSON, SGT. WILLIAM McCAIG, OFFICER
WILLIAM MARKS, OFFICER CELESTE GRAHAM,
and OTHER UNKNOWN OFFICERS, Individually
and in their Official Capacities, jointly and severally,

       Defendants.
_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on the 27th day of March, 2014

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This matter is before the Court on: (1) Defendants' Motion for Summary Judgment (Docket

#38), and (2) Defendants' Motion to Extend Discovery Motion Filing Cutoff and to Dismiss the

Case, Strike Witnesses and/or Compel Outstanding Discovery (hereinafter, "Motion to

Extend/Dismiss") (Docket #50).  Both motions are fully briefed.[1]  The Court finds that the facts and

---

[1]Plaintiff's Motion for Enlargement of Time (Docket #41) is DENIED as moot as she timely
filed her response to Defendants' Motion for Summary Judgment.  Plaintiff also filed an
Objection and Motion to Strike Exhibit 4 of Defendants' Reply to Plaintiff's Response to

legal arguments pertinent to the motions are adequately presented in the parties' papers, and the decision process will not be aided by oral arguments. Therefore, pursuant to E.D. Mich. Local R. 7.1(f)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted by the parties, without this Court entertaining oral arguments. For the reasons that follow, Defendants' Motion for Summary Judgment (Docket #38) is GRANTED IN PART and DENIED IN PART, and Defendants' Motion to Extend/Dismiss (Docket #50) is DENIED.

## II.  BACKGROUND

This is a tragic case that arises out of the suicidal death of Alphonso Turner ("Turner"), Plaintiff's decedent, on September 26, 2010, while in custody at the City of Ecorse (the "City") jail. The pending counts before this Court include claims pursuant to 42 U.S.C. § 1983 ("Section 1983") for: (a) excessive force; (b) failure to intervene; (c) deliberate indifference to medical needs, (d) municipal liability, and (e) supervisory liability.[2] The following "facts" are generally in dispute, however, the Court must consider all evidence in a light most favorable to Plaintiff in considering Defendants' motion–and the Court does so hereafter. *See Matsushita Electric Industrial Co. v.*

_____

Defendants' Motion for Summary Judgment (Docket #49), wherein Plaintiff objected to Defendants filing a signed affidavit of Defendant Celeste Graham a day after Defendants filed their reply brief with an unsigned affidavit of Defendant Celeste Graham. The Court finds the filing of the signed affidavit (to replace a timely filed, unsigned affidavit with the same language) permissible. Accordingly, the Court DENIES Plaintiff's Objection. As will be evident in the Court's discussion of Defendants' motion for summary judgment, however, the substance of Defendant Celeste Graham's affidavit (Exhibit 4 to Defendants' reply brief) had no bearing on the Court's analysis or conclusions.

[2]The Court declined supplemental jurisdiction over Plaintiff's state law claims, and Plaintiff voluntarily withdrew her Section 1983 claims for: (1) unlawful search and seizure (false arrest), and (2) conspiracy.

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party.").

Turner was married to Plaintiff, and they resided in Ecorse, Michigan, at the time of his death. Turner had been diagnosed with paranoid schizophrenia, bipolar disorder, and manic depression. On September 25, 2010, Turner was released from a mental hospital and his psychotropic medications were being altered at that time. Nonetheless, Turner spent the day and evening at home drinking alcohol. According to Plaintiff, Turner ultimately told Plaintiff that he was suicidal and wanted to go to the hospital. Therefore, in the early morning hours of September 26, 2010, Plaintiff called 911 and stated (the 911 responder's comments are in brackets):

> I need an ambulance to send to . . . Street. . . . I need an EMS . . . Um, my husband, he's um, having a fit. You know, he walking around here talking about killing people, walking around with gun . . .[He has a gun?] Yes. [So you need the police, not the rescue]. I need somebody to come get him. [All right. What's his name?] Alphonso Turner. [All right. We'll (unintelligble) somebody over there, ok?]. All right. [Ok.]

Defendant Sergeant James Frierson ("Frierson") was working at the City Police Department ("EPD") as the watch commander that evening, and it was his duty to answer the 911 calls, dispatch, and watch prisoners. Frierson took the above-described 911 call from Plaintiff. Frierson then called the City Fire Department and dispatched a rescue team to the Turner home. According to Mark Wilson (the Captain of the City Fire Department) and Jeffery Wilson (a sergeant at the City Fire Department), the nature of the dispatch, which came directly from the EPD, was a "medical" run for "possible suicide" or "attempted suicide" (the Court has not been provided with a recording of that call, if there was one). Jeffery Wilson, Lieutenant Edward Madrigal and Mark Wilson, all of whom are certified emergency medical technicians ("EMTs"), responded to the dispatch to the Turner

home.   At about the same time, Frierson also dispatched Defendant Officer William Marks ("Marks") and Defendant Officer Celeste Graham ("Graham") to the scene.  Graham testified that she was dispatched to assist "rescue," and Marks likewise testified that he was dispatched to the Turner home to "assist rescue."  Marks arrived after Graham.[3]  The only officer working at the EPD during the events involving Turner was Defendant Sergeant William McCaig ("McCaig").  McCaig was the road patrol supervisor of Marks and Graham, but he was not present for the events at or around the Turner home on September 26, 2010.

The EMTs arrived at the Turner home first, and they sought to take the vitals of Turner.  According to Plaintiff, Turner was laying face down in the street at the time, and Turner told the EMTs, "I want to go to the hospital. I am suicidal. I am sick."  Mark Wilson characterized Turner as speaking "mumbo jumbo" and "talking kind of crazy."   According to Mark Wilson, Turner's "mumbo jumbo" and "talking kind of crazy" comments were made in the presence of Marks and Graham.  Mark Wilson stated that his guard was up since they were on a run for an "attempted suicide."  Mark Wilson also described Turner's conduct as irrational and bizarre.  Marks also heard Turner state that he needed "help."

As Turner continued to lie on the street and in the presence of Marks and Graham, Mark Wilson used his boot to knock a cigarette out of Turner's hand.  Turner had stitches in a finger on that hand, and the stitches may have opened, resulting in bleeding.  According to Plaintiff, Turner jumped up and said, "Don't touch me, y'all trying to kill me. I just want to go to the hospital. I'm suicidal."  Turner accused Mark Wilson of smashing and breaking Turner's finger, but Turner still

---

[3] Marks' in-car video was not working.  The parties did not indicate whether Graham had an in-car video or whether it was working.  No in-car video of any kind was presented to the Court.

4

would not let the EMTs take his vitals.  According to Plaintiff, Turner then laid back down, again requested to be taken to the hospital, and stated: "I'm suicidal, I don't feel good, I'm sick, just take me to the hospital."  According to Plaintiff, Turner also said that he was bipolar, and Marks and Graham were present for all of those statements.

It is undisputed that, at that point, Turner was yelling to everyone at the scene that he wanted to go to the hospital.  Marks, while in the presence of Graham and the EMTs, specifically heard Turner yell, "Take me to the hospital."  According to Plaintiff, Turner then sat on the curb and stated repeatedly that he wanted to go to the hospital and that he was suicidal.  Based on all of the foregoing events, Marks aimed his taser at Turner.  Jacoby Bonner (Plaintiff's son) testified that, at this point, Plaintiff specifically stated to Marks that Turner was "suicidal" and that Turner just wanted to go to the hospital.  Plaintiff and Jacoby Bonner also pleaded with Marks to not tase Turner, and Marks put his taser away.  Plaintiff again requested Turner be taken to the hospital, and Jacoby Bonner heard Turner state to Graham, Marks and the EMTs, "Fuck you all. Fuck life. I just want to die."

At some point, Plaintiff told Graham that Turner was suicidal and that Turner needed to go to the hospital because he had not taken his medications.  Plaintiff stated that she told the officers that Turner had just been released from the mental hospital a couple days prior and that he was on new medications.  According to her police report about the incident, Graham asked Turner if he was on medication, and Turner told Graham that he was bipolar and had not taken his medication.  Graham's police report indicated that Turner "demanded to be taken to the hospital."  Based on Turner's behavior, Graham formed a belief at the scene that Turner needed medical attention for, among other things, his mental health.  Graham told Turner that she would get him "help."

5

Turner again laid down in the street, and Marks climbed on Turner's back.  Marks stated that Turner repeatedly yelled that he wanted to be taken to the hospital while rolling around on the ground, but Marks stated that Turner also said he wanted to be taken to jail.  At this point, Marks handcuffed Turner, arrested Turner for disturbing the peace, and determined that Turner would be taken to jail.  Graham testified that she did not advise Marks to take Turner to the hospital from the scene, and Mark Wilson testified that he "may" have told Marks that Turner needed to go to the hospital.  When Mark Wilson completed a Wayne County EMS Run Form documenting his medical run regarding Turner, however, Mark Wilson handwrote: (1) "attempted suicide" under the caption "Primary Complaint," (2)  "bipolar" "skits" [schizophrenia] and an abbreviated version of "paranoia" under the caption "Other History," and (3) "Man stated he wanted to go to the hospital" under the caption "Onset Date/Time."

Marks began to transport Turner to the City jail, a trip that could take less than one minute and thirty seconds from the Turner home if driven at full speed under lights and sirens. When Marks called the EPD while transporting Turner, Marks stated that Turner was "very intoxicated" and was "trying to break the glass in the back of my patrol car."  At his deposition, Marks testified that he observed Turner in the back of his patrol car making no sense and banging his face numerous times into the plexiglass partition between the front and back seat.  Marks testified that there was no threat to him while Turner was banging his face into the partition.  Nonetheless, during the transport, Marks pulled his vehicle over, entered the rear of vehicle, and deployed his taser upon Turner two times.  Both times, Turner was handcuffed and his whole body was in the back of the patrol car.  At some point while Marks had the patrol car pulled over, McCaig arrived at that scene.  McCaig denied being present either time Marks tased Turner, but Marks testified at his deposition and told

6

Michigan State Police Detective Sergeant Robert Weimer ("Weimer"), the external investigator into Turner's in-custody death, that McCaig was present for at least the second tasing. Neither Marks nor McCaig took Turner to the hospital after he was tased, and both Marks and McCaig escorted Turner to the City jail from the scene of the tasing.

At the City jail, Turner was taken to a holding area also known as the processing room, a room in which there was a functioning video camera. Turner was still handcuffed when he was put into the processing room by McCaig. Both Marks and McCaig were present and engaged with Turner while he was in the processing room. Typically, personal identifying information of the detainee is obtained, and detainees are asked the questions on the front and back of the EPD "Arrest Record." The EPD Arrest Record includes a Medical History category with a total of twelve questions. The arresting officers are supposed to document a detainee's medical needs, though it is undisputed that EPD officers have received no training regarding mental health and suicidal risk assessment. Based on the briefs filed, the policy of the EPD is that the Arrest Record is to be filled out completely, however, it also provides that if a detainee is deemed not to be "cooperative," the Medical History section need not be filled out at all. The Court was not provided with any written EPD policy that stated anything regarding the manner in which the Arrest Record is to be filled out, whether filling out the Arrest Record is a requirement, or whether there are exceptions to any such requirement. Written EPD policy does provide that, while in the processing room:

> The prisoner shall be relieved of all property and thoroughly searched. All female prisoners will be searched by a female and likewise, all males by a male. Prisoners are to be stripped of any item which might be used by the inmate as a weapon or to harm himself, such as a necktie, shoelace, belt, etc.

Graham testified, however, that detainees have been placed in cells with their belts, shoes, and shoelaces numerous times in the past when they were out of control.

7

There is a two minute, twelve second video of the period when Turner was in the processing room, but the video lacks any audio component.  The "facts" in this paragraph are based on the Court's viewing of the processing room video (as opposed to the position of Plaintiff or Defendants). The processing room video shows McCaig conducting two separate searches of Turner's person, with Turner alternatively sitting on the bench, then standing, appearing to yell at McCaig but also allowing McCaig to pat down and take personal items from Turner's clothing.  At one point, McCaig pointed his finger at Turner.  At another point, McCaig appeared to have a hold of Turner with one hand and appeared to push or shove Turner with that hand as he was turning to leave the processing room.  As a result of that push or shove, Turner, still handcuffed with his arms behind his back, moved toward the wall/corner that was less than two feet away and against the bench that was right in front of where Turner was standing.  It is not clear if Turner's body or head made contact with the wall/corner as a result of the push or shove.  Turner's body did not rest against the wall/corner, nor did he stumble, fall, or sit as a result of the push or shove, and Turner remained standing. Less than 10 seconds later, McCaig grabbed Turner's shirt in the upper middle of Turner's back, and McCaig pulled Turner backwards out of the room.  It is possible but not clear that some of Turner's dreadlocks were grabbed when McCaig pulled Turner by the back of Turner's shirt. Marks appeared in the video intermittently, but he stood at the entry to the processing room and did not enter the processing room.  At the times Marks was visible, McCaig was between Marks and Turner.

Although some of Turner's personal effects were taken by McCaig during the processing room pat downs, no one took Turner's shoes, shoelaces or belt while Turner was in the processing room.  Likewise, when Marks filled out Turner's Arrest Record, the Medical History section was

8

left entirely blank.  Frierson signed the (incomplete) Arrest Record prepared by Marks.  According to McCaig and Marks, prior to and while Turner was in the processing room, Turner: (1) would not provide any information, and (2) was uncooperative, resistant, combative and threatening to kill people when his handcuffs were removed.

Once McCaig pulled Turner from the processing room, and in the presence of Graham, McCaig and Marks escorted Turner down a hall outside of the jail cells.  The cell in which Turner was ultimately placed was almost directly across the hall from the doorway Turner and the officers used when entering the hall after Turner was escorted from the processing room.  The time between when Turner entered the hallway and when Turner was put into his cell was captured by a functioning video camera in the hallway.  Once again, the video lacked any audio component.  As with the processing room video, the "facts" regarding the events in the hallway are based on the Court's viewing of the hallway video (as opposed to the position of Plaintiff or Defendants).  From the time Turner entered the hallway until he entered through the door to his cell, Turner was visible on the hallway video for 70 seconds.

As Turner entered the hallway, he remained handcuffed with his arms behind his body.  McCaig turned Turner 180° so that Turner was facing the wall through which they had just entered (the wall across the hall from the cell where Turner would be placed).  McCaig brought Turner's arms upwards behind Turner's body in order to remove the handcuffs.  As McCaig removed the handcuffs, Turner put his left hand on the back of his head and extended his right arm straight out.  According to McCaig, Turner tensed up when McCaig was removing the right handcuff.  McCaig then used his left forearm to push and hold Turner's body against the wall and kicked Turner's feet apart while removing the handcuff from Turner's right arm.  Marks, who was standing on Turner's

9

left side, then grabbed Turner's left hand from the back of Turner's head and held Turner's arm bent behind Turner's head while McCaig continued to hold Turner against the wall. Marks then appeared to apply pressure to Turner's left arm, turned Turner 180° to face the cell into which Turner would be housed, guided Turner through the door to that cell, and pulled the cell door shut at 2:44 a.m. Graham was present for essentially the entire time that McCaig and Marks had Turner in the hallway, but she did not participate in physically moving Turner from the processing room to the cell where he was housed.

The cell where Turner was housed is commonly known as the "detox" cell or the "drunk tank." Neither Marks, Graham, nor McCaig took Turner's shoes, shoelaces or belt from Turner before he was put into the detox cell for what all EPD officers classified as a "cool down period." The "cool down period" is an unwritten practice utilized by EPD officers at times when "the prisoner is just totally out of control," and the detainee needs to be placed in a cell immediately. When a "cool down period" is utilized, officers do not necessarily assess suicide risk or inquire into the detainee's other serious medical needs before the detainee is placed in a cell, even though the detainee may still have items such as a belt, shoes, or shoelaces on his or her person.

The detox cell at the EPD jail is equipped with a video camera that is monitored at the watch commander's desk. Weimer's investigation revealed that: (a) on September 26, 2010, the video camera in the detox cell was covered with what appeared to be dried toilet paper, and the video camera in the detox cell had been covered by a former inmate since September 8, 2010. Frierson told Weimer that the camera had not been working for "awhile," and Champagne told Weimer that the surveillance camera in Turner's cell was not operating for "some time." As such, none of the events that transpired in the detox cell while Turner was there were captured on video.

10

The watch commander is responsible for ensuring that the jail cell cameras are working and recording every shift, and he or she is to report any malfunctions to Champagne. The EPD policy itself did not require that Champagne check the camera monitors. Although Champagne was aware that these cameras had failed to function on prior occasions, Champagne only "periodically" checked the surveillance monitors to ensure that: (1) the cameras were functioning, and (2) watch commanders were properly informing him if a camera was not functioning properly. Marks, Graham and McCaig also did not verify if the camera in Turner's cell was properly functioning at any point on September 26, 2010, but they had no duty to do so.

At some point prior to 3:30 a.m., Marks returned alone to the Turner home to speak to Plaintiff. After Plaintiff inquired, Marks told Plaintiff that Turner had not been, nor would he be, taken to the hospital because Turner was going to be criminally charged and was being held at the City jail. Plaintiff testified that she again told Marks that Turner needed to be taken to the hospital because Turner was suicidal. When Marks left the Turner home, he returned to the City jail to continue working on his computer-generated report on the arrest of Turner. Upon his return to the City jail, Marks did not check on Turner, did not speak to McCaig, did not go near the watch commander desk area, and did not tell or remind anyone to take Turner's shoelaces out of his cell.

Frierson testified that he was: (a) unable to see the live feed on the watch commander jail cell monitor from his desk of Turner's cell, and (b) aware that Turner had been tased. Around 4:00 a.m., McCaig told Frierson that Turner was in the cell and that Turner still had his "personal property" and "clothes." Frierson checked on Turner about 4:30 a.m. because Frierson heard "male voices" and "banging" on the wall and cell doors. Frierson testified that he formed a belief that Turner was the "nature of the noise" Frierson was hearing. Turner stopped banging when Frierson

checked on him.    Frierson observed Turner completely naked in his cell, but Frierson did not attempt to take Turner's clothes or shoes because Frierson was "trying to just calm [Turner] down." At about 4:35 a.m., Frierson spoke with Turner for about one and half minutes.   According to another detainee in the City jail on the early morning of September 26, 2010, Calvin Shackelford ("Shackelford"), Turner specifically asked Frierson for medical attention because Turner said he was unable to breathe and for the injury to his hand.   Frierson told Turner, "I'll have somebody check you out, when you calm down."   Frierson then returned to his watch commander desk, but he never called for medical response.   Frierson subsequently left the City jail for about 20 minutes to get something to eat.   McCaig testified that he "assumed" desk duties while Frierson was out.   McCaig did not physically check on Turner at any time while McCaig was on desk duty, nor did McCaig maintain or have any type of visual observation of Turner.

At approximately 5:51 a.m., the video from the hallway camera shows Frierson in the hallway looking in Turner's cell.   It was at this point that Frierson saw Turner dead, hanging by his shoelace in the cell.   It is undisputed that there was no video observation of Turner or any in-person physical check of Turner between the first safety check by Frierson (at approximately 4:35 a.m.) to the time he found Turner hanging by his shoelace 75 minutes later.   Weimer's investigation revealed that one of Turner's shoes was missing a shoelace–the same shoelace that was used as the instrument for the hanging. An autopsy conducted by the Wayne County Medical Examiner's Office concluded that: (a) the cause of death was asphyxia by hanging, and (b) the manner of death was suicide.   The autopsy also indicated that Turner's "heart was enlarged with the myocardium of the left ventricle hypertrophied."

Shackelford was detained in the cell right next to Turner's cell.  In a handwritten affidavit, Shackelford stated that he observed Turner's interaction with Marks, Graham and McCaig in the hallway outside of the cells (the interaction that was also recorded on the hallway video camera, as described above).  According to Shackelford, Turner was "begging" Marks, Graham and McCaig for medical help because he was having trouble breathing and questioned why he was not taken to the hospital.  Shackelford stated that the officers ignored Turner's plea for medical attention, and Turner was put into the cell.  Shackelford did not observe Turner make any threats to any of the police officers in the hallway.  Shackelford stated that Turner just kept asking the officers why he was tased and why they would not take him to the hospital.  Shackelford further stated that Turner "begged" and "yelled" for help for at least an hour to an hour and a half, including yelling, "I can't breathe."  Shackelford also stated that Turner was "…pounding for help for a long time til finally the black man cop [Frierson] went to his cell."  According to Shackelford, Turner specifically told Frierson that Turner could not breathe and that his hand was hurting, but Frierson simply told Turner to just "lay down" and then left.  Shackelford stated that Turner kept begging and yelling for help until Shackelford heard nothing but silence.

The City did not discipline any of the Defendant officers for any policy violations, nor did EPD log any misconduct involving such officers as a result of any of the events from the time of the 911 call taken by Frierson to the time Frierson discovered that Turner was dead in the detox cell.

## III.  LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S. at 323.  The moving party discharges its burden by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could

14

reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV.  ANALYSIS

Plaintiff seeks to recover for numerous federal claims, all of which are rooted in Section 1983.  The defendant officers argue they are entitled to qualified immunity with respect to each of Plaintiff's federal claims.

> To succeed on a claim under section 1983, a plaintiff must demonstrate: (1) deprivation of a right secured by the Constitution or laws of the United States, (2) caused by a person acting under color of state law, (3) occurring without due process of law. *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir.1994). A government official performing discretionary functions is entitled to qualified immunity in her individual capacity if her conduct does not violate constitutional standards in light of clearly established law at the time of the alleged violation. *Barber v. City of Salem, Ohio*, 953 F.2d 232, 236 (6th Cir.1992). The right claimed must be more than merely a generalized right; it must be clearly established in a particularized sense so that a reasonable official in the defendant's position knows that her actions violate that right. In short, the illegality of the challenged conduct must be apparent. *Danese v. Asman*, 875 F.2d 1239, 1242 (6th Cir.1989).

*Davis v. Fentress Cty. Tenn.*, 6 Fed.Appx. 243, 248-49 (6th Cir. 2001). *See also Perez v. Oakland Cty.*, 466 F.3d 416, 426 (6th Cir. 2006) (citations and internal quotations omitted) ("Under the qualified immunity doctrine, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

> In evaluating claims of qualified immunity under section 1983, [the Court] first determine[s] whether a constitutional violation occurred and only then determine[s] whether the right violated was clearly established such that a reasonable person would know of it. *Williams*, 186 F.3d at 691. Therefore, [the Court] begins by identifying the contours of the substantive right allegedly violated. *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

*Davis*, 6 Fed.Appx. at 249.

**A.     Dismissal of the Unknown Officers**

Plaintiff has failed to identify, name or serve the purported Defendants labeled in the case caption as "Unknown Officers."  As such, Plaintiff's cause of action against those Defendants is subject to dismissal. *See Petty v. Cty. of Franklin, Ohio*, 478 F.3d 341 (6th Cir. 2007).

**B.     Plaintiff's Excessive Force Claims**

The Fourth Amendment protects a person from being subjected to excessive physical force during the course of an arrest, booking, or other police seizure. *Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir. 2008); *Phelps v. Coy*, 286 F.3d 295, 299-300 (6th Cir. 2002).  The Fourth Amendment requires that an officer's use of force be objectively reasonable, and courts must balance the consequences to the individual against the government's interests in effecting the seizure. *Graham v. Connor*, 490 U.S. 386, 396 (1989).  "[T]he objective-reasonableness standard . . . depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (citing *Graham*, 490 U.S. at 395-96).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.  "Relevant considerations include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Fox*, 489 F.3d at 236 (quoting *Graham*, 490 U.S. at 396).  In addition, an officer is liable for excessive force for failure to intervene when: (1) the officer observed or had reason to know that excessive force would be or was being

16

used, and (2) the officer had the opportunity and the means to prevent the harm from occurring. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

Plaintiff asserts that there were three events of excessive force used by Marks and/or McCaig, each of which Plaintiff also asserts involved a failure to intervene by another officer.

1. *Tasing by Marks*

The first event was when Marks tased Turner two times while Turner was handcuffed in the back of the patrol car and McCaig (Marks' supervisor) was present and failed to intervene. The Court finds that there is a genuine dispute of material fact as to whether Marks subjected Turner to excessive force when Marks tasered Turner twice while Turner was handcuffed in the back of the patrol car while in transit to the City jail. As to the first element, Turner was arrested for a misdemeanor (disturbing the peace), so the crime was not severe. On the other hand, Turner was out of control according to: (1) all present at the scene of the arrest, and (2) the recording of Marks' radio contact with the EPD while Marks was transporting Turner to the jail. With respect to whether Turner posed an immediate treat to the safety of Marks or anyone else, it is undisputed that Turner was handcuffed in the back of the patrol car when Marks stopped the car and tasered Turner. Even if Turner was still out of control in the back of the patrol car (as Marks has testified), the Court finds that a reasonable fact finder could determine that Turner was not an immediate threat to Marks or anyone else while handcuffed in the back of the patrol car. In fact, Marks testified that Turner was not a threat to Marks at that time, nor did Marks identify any one else present or in any danger. Finally, as Turner had been arrested and was handcuffed in the back of the patrol car, the Court finds that a reasonable fact finder could determine that Turner was not actively resisting arrest or

17

attempting to evade arrest by flight.[4]  The Court also finds that any reasonable officer would know that tasing Turner when Turner was handcuffed and in the back of the patrol car would violate Turner's clearly established constitutional rights to be free from the use of excessive force.

For the foregoing reasons, the Court concludes that: (1) there is a genuine dispute of material fact as to whether Marks violated Turner's constitutional rights when Marks tasered Turner two times while Turner was handcuffed and in the back of the patrol car, and (2) Marks is not entitled to qualified immunity with respect to the use of his taser against Turner.

The Court also finds viable Plaintiff's claim against McCaig for excessive force based on a failure to intervene.  Although there seems to be an absence of evidence that McCaig was present for the first tasing (or that he knew about it prior to arriving at the scene), Marks: (a) testified at his deposition, and (b) told Weimer during the Michigan State Police's investigation of Turner's in-custody death, that McCaig was present for at least the second tasing.  Viewed in a light most favorable to Plaintiff, if McCaig was present and a tasing had already occurred (which would have been evident to someone present as Marks had his taser out and the taser wires were attached to Turner), McCaig had both the opportunity and the means to prevent the harm from occurring.  Not only was he another officer on the scene, he also was Marks' supervisor and could have ordered Marks not to taser Turner (who was still handcuffed and in the back seat of the patrol car) a second time.  In addition, the Court concludes that any reasonable officer would have known that a failure

---

[4]In its reply brief, Defendants cite a number of cases that permit force, including the use of a taser, when an individual is non-compliant or a threat to himself, including individuals who are already handcuffed.  Moreover, none of the cases cited by Defendants recognized the right to tase an individual who is already handcuffed <u>and</u> in the back of patrol car.  Accordingly, the Court does not find the cases cited by Defendant to be persuasive in this matter.

to intervene in that situation would violate clearly established law regarding the use of excessive force.

Accordingly, Plaintiff's claims against both Marks and McCaig for excessive force based on the tasings of Turner by Marks shall remain before the Court.

> 2.    *Processing Room*

The second claim of excessive forces is based on when McCaig: (a) pushed Turner toward the wall while in the processing room, and (b) then dragged Turner out of the processing room by the back of Turner's shirt (and possibly some of Turner's hair), during which time Marks was present and failed to intervene.  After reviewing the video of Turner in the processing room, the Court finds, as a matter of law, that there was no use of excessive force by McCaig.[5]  At worst, McCaig: (1) pushed Turner but not with such force as could cause Turner to do more than graze a wall/corner in extremely close proximity to where Turner was standing; and (2) incidentally grabbed some of Turner's long hair when McCaig grabbed Turner's shirt in the upper middle part of Turner's back and pulled Turner out of the processing room.  As McCaig cannot be liable for excessive force with respect to the processing room events, Marks also cannot be liable for excessive force due to a failure to intervene with respect to this incident.  Moreover, even if McCaig could be subject to liability for the processing room events, there is no evidence that Marks had an opportunity or the means to prevent McCaig's use of "excessive force."  Marks' mere presence did not provide him

---

[5]The Court notes that Plaintiff's brief lacked any argument that identified exactly how the conduct of Marks or McCaig inside the City jail violated clearly established law with respect to the use of excessive force.  To the extent Plaintiff addressed alleged excessive force related to those two instances, Plaintiff did no more than set forth certain facts in her "Counter Statement of Facts" section, wherein she offered her interpretation of the videos from the functioning cameras in the processing room and hallway of the City jail.

with an opportunity or the means to prevent either of the two alleged uses of excessive force by McCaig in the processing room.  Marks was standing at the edge of or outside the processing room, McCaig was between Marks and Turner at all times.  It is not clear that Marks could even see what McCaig was doing with his hands before McCaig's hand(s) pushed or grabbed Turner.  Finally, there is no evidence that Marks knew or reasonably should have known that either alleged use of excessive force would occur before it did.

Accordingly, the Court finds that McCaig and Marks are entitled to summary judgment with respect to Plaintiff's excessive force claim related to events in the processing room.

### 3.    *Hallway of the City Jail*

The third incident of excessive force that Plaintiff alleges occurred when McCaig and Marks had Turner in the hallway of the jail, McCaig allegedly pushed Turner face first into the wall, and Marks allegedly subjected Turner to various "grotesque" manipulations of his arms, during which time Graham was present and failed to intervene.

After reviewing the video of the time Turner was in the hallway of the City jail, the Court finds, as a matter of law, that there was no use of excessive force by McCaig or Marks.  What the video does show is that the officers utilized standard police methods for moving a prisoner, removing the prisoner's handcuffs, and guiding the prisoner into a cell.  The methods used on Turner were not gentle at all times, as Turner was not cooperative.  As such, Marks and McCaig were entitled to use some force to move Turner.  The video reveals that the force Marks and McCaig used, however, was force reasonable and necessary to safely move Turner within the City jail, to remove his handcuffs, and to put Turner in his cell.  Initially, McCaig placed Turner against the wall, face first, in order to remove Turner's handcuffs.  When McCaig removed the handcuff from Turner's

20

left arm, McCaig placed Turner's left arm behind Turner's head and extended Turner's right arm straight out.  Even if Turner did not tense up at that point (as McCaig stated), it was not unreasonable for an officer to use his forearm to push a detainee's body against a wall and separate the detainee's feet to prevent the detainee from leveraging himself against the officers.  Finally, contrary to Plaintiff's suggestions, neither officer "grotesquely" manipulated either of Turner's arms. Rather, Marks applied pressure to Turner's left arm to get Turner to turn around and escort Turner into the detox cell.  Once again, this is a standard, legal law enforcement method.

For the reasons set forth above, the Court finds that McCaig and Marks are entitled to summary judgment insofar as Plaintiff's excessive force claim relates to their actions in the hallway of the City jail.  As neither McCaig nor Marks can be liable for excessive force regarding the events in the hallway of the City jail, Graham also cannot be liable for a failure to intervene with respect to that incident.  Accordingly, Graham is also entitled to summary judgment insofar as Plaintiff's excessive force claim relates to any events in the hallway of the City jail**.**

### 4.    *Conclusion*

For the reasons set forth above, the Court: (a) dismisses any and all of Plaintiff's claims of excessive force against Graham, (b) dismisses Plaintiff's claim of excessive force against McCaig and Marks with respect to the alleged excessive force used by McCaig in the processing room at the City jail, (c) dismisses Plaintiff's claim of excessive force against McCaig and Marks with respect to alleged excessive force used by McCaig and Marks in the hallway of the City jail, and (d) grants Defendants' motion for summary judgment as it relates to the claims of excessive force in the processing room and the hallway of the City jail.

The Court also finds a genuine dispute of material fact as to Plaintiff's claim of excessive force against McCaig and Marks with respect to the tasing of Turner in Marks' patrol car and concludes that neither Marks nor McCaig is entitled to qualified immunity with respect to the tasings. Therefore, the Court denies Defendants' motion for summary judgment as it relates to Plaintiff's excessive force claim based on the tasing of Turner by Marks.

**C.     Deliberate Indifference**

In order to state an Eighth Amendment violation regarding medical treatment, a prisoner must demonstrate that the defendant acted, or failed to act, with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). *See also Helling v. McKinney,* 509 U.S. 25, 32 (1993) (when a governmental actor "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs–*e.g.*, ... medical care ..., it transgresses the subjective limits on state action by the Eighth Amendment"). A finding of deliberate indifference is satisfied if the plaintiff can establish both an objective component and a subjective component. First, the plaintiff must show "the existence of a sufficiently serious medical need" or a condition that is objectively serious. *Farmer v. Brennan*, 511 U.S. 825 (1994); *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). Second, the plaintiff must show the prison official knew of the need or condition and acted with deliberate indifference toward the inmate's health or safety, which is a subjective standard. *Farmer*, 511 U.S. at 838-39; *Flanory v. Bonn*, 604 F.3d 249, 254 (6th Cir. 2010) (citing *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991)).

*1.     Psychological/Suicidal Risk*

On Plaintiff's claim of deliberate indifference as it relates to Turner's suicide, Defendants do not challenge that the first (objective) component is satisfied, as Turner had a serious medical

need–*i.e.*, psychological/suicidal risk. *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994); *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992); *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988). Defendants assert, however, that Plaintiff cannot satisfy the second (subjective) component, as a matter of law. The "subjective component" of a deliberate indifference claim requires Plaintiff to establish that a "prison official" knew of and acted with deliberate indifference toward an inmate's health or safety. *Farmer*, 511 U.S. at 437. The inmate must show that the prison official had a "sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000). The official must "both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and must also draw that inference." *Id.* This standard requires a showing of "something more than mere negligence." The Defendant must have "recklessly disregarded a known risk." This is a very high standard of culpability exceeding gross negligence. *Ross v. Duggan*, 402 F.3d 575, 590 n.7 (6th Cir. 2004). Further, because culpability under this test is personal, the subjective component must be addressed for "each officer individually." *Meier v. County of Presque Isle*, 376 Fed.Appx. 524, 528-29 (6th Cir. 2010) (citing *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005)).

    a.    **The Officers on Duty**

In *Davis*, the Sixth Circuit addressed an individual officer's entitlement to qualified immunity in a case involving a detainee's suicidal death by telephone cord in the cell. The *Davis* court concluded that the individual officer was entitled to qualified immunity on that plaintiff's deliberate indifference claim, stating the relevant law as follows:

> When prison officials act with deliberate indifference to the serious medical needs of prisoners so that they inflict unnecessary pain or suffering, their actions violate the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285,

50 L.Ed.2d 251 (1976); *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir.1994). Pretrial detainees enjoy analogous protection under the Fourteenth Amendment's Due Process Clause. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Horn*, 22 F.3d at 660.

Case law in this circuit has established that psychological needs manifesting themselves in suicidal tendencies are serious medical needs for purposes of the due process analysis. *E.g., Horn*, 22 F.3d at 660; *Barber*, 953 F.2d at 239–40 (**identifying the proper inquiry in suicide cases as "whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs**"); *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir.1988). Nonetheless, there is no general right of pretrial detainees to be correctly screened for suicidal tendencies. *Danese*, 875 F.2d at 1244. Nor has this court recognized a generalized right of a prisoner to be protected against committing suicide. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1096–97 (6th Cir.1992). Against this background, the district court correctly concluded that the right at issue [was] the detainee's right to reasonable protection against taking his own life if that detainee has demonstrated a strong likelihood that he will commit suicide.

To establish a violation of this right, Plaintiffs must demonstrate that the decedent demonstrated a strong likelihood of taking her own life and that Defendants acted with deliberate indifference to that threat. Because we construe the facts in the light most favorable to the nonmoving party for purposes of summary judgment, we assume, as the district court did, that a jury could reasonably find that [decedent]'s statements and behavior demonstrated a strong likelihood of suicide. **At issue here is whether Plaintiffs presented evidence from which a jury could reasonably find that government officials responded to this threat with deliberate indifference.**

*Davis*, 6 Fed.Appx. at 249 (emphasis added).

As in *Davis*, this Court shall assume that, when viewing the evidence in a light most favorable to Plaintiff, "a jury could reasonably find that [Turner's] statements and behavior demonstrated a strong likelihood of suicide."[6] Thus, as in *Davis*, the issue here is whether Plaintiff

_____

[6]The following facts might support such a finding: (a) two of the EMTs testified that they were dispatched on a "medical" run for "possible suicide" or "attempted suicide;" (b) Graham and Marks were dispatched to "assist rescue;" (c) Turner repeatedly stated in the presence of Marks and Graham that he wanted to go to the hospital, and he stated that he was suicidal and wanted to

"presented evidence from which a jury could reasonably find that [the officers] responded to this threat with deliberate indifference."   This issue "presents a mixed question of law and fact[.]" *Id.* at 250.  "[I]n order for [an officer's] conduct to constitute deliberate indifference, [the officer] must not only have subjectively perceived facts from which [he or] she could draw an inference that [Turner] presented a substantial suicide risk, [he or] she must also have consciously disregarded that risk." *Id.*   In other words, Plaintiff "must show that the pertinent individuals knew of and disregarded an excessive risk to [Turner's] health or safety." *House v. Cty. of Macomb*, 303 F.Supp.2d 850, 854 (E.D. Mich. 2004) (citations omitted).  However, "when an official fails to act in the face of an obvious risk of which she should have known but did not, the official has not inflicted punishment in violation of the Eighth [or Fourteenth] Amendment." *Davis*, 6 Fed.Appx. at 250 (citing *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994)).

In this case, the Court finds that no reasonable jury could find any of the Defendant officers were deliberately indifferent to any threat of suicide by Turner.  This is true even if Turner could be said to have "demonstrated a strong likelihood of taking [his] own life," because there is no evidence any of the officers "subjectively perceived facts from which [he or] she could draw an inference that [Turner] presented a substantial suicide risk, [such that the officer] must also have consciously disregarded that risk." *Davis*, 6 Fed.Appx. at 250.

---

die; (d) Turner was speaking "mumbo jumbo" and "talking kind of crazy" in front of Marks and Graham; (e) Graham's police report states that Turner told her that he was bipolar and had not taken his medication–and that Turner "demanded to be taken to the hospital;" and (f) Mark Wilson's EMS Run Form regarding Turner stated: (1) "attempted suicide" under the caption "Primary Complaint," (2)  "bipolar" "skits" [schizophrenia] and an abbreviated version of "paranoia" under the caption "Other History," and (3) "Man stated he wanted to go to the hospital" under the caption "Onset Date/Time."

First, the 911 call from Plaintiff to Frierson indicated Turner was homicidal (if anything), not suicidal, and Plaintiff just stated that she "need[ed] someone to come get him."  None of the other recordings produced for the Court indicate that suicide was a concern, nor do any of the videos suggest suicidal behavior.  Second, all witnesses, including Plaintiff and Jacoby Bonner, have testified that Turner was very intoxicated at the time the EPD officers and EMTs arrived at the scene outside the Turner home.  There is testimony that he was speaking "mumbo jumbo" and was out of control at several times, all of which are consistent with the speech and actions of a person who is very intoxicated.  Likewise, during his call to the EPD while transporting Turner (*i.e.*, his contemporaneous comments, not deposition testimony years later), Marks stated that Turner was "very intoxicated."  Marks did not say that Turner was acting suicidal or that Turner had expressed suicidal thoughts or threatened suicide.

Third, although there is evidence that Turner and Plaintiff stated that Turner was suicidal, there is no testimony that Turner was specifically stating he was going to kill himself : (a) at the scene outside the Turner home, or (b) at any other time.  Likewise, there is no testimony or evidence that Turner: (1) was acting in a suicidal manner at the scene outside of the Turner home, (2) had a history of suicidal behavior, or (3) had ever made or threatened suicide attempts.  Fourth, the affidavit submitted by Shackelford (the detainee in the cell next to Turner's cell at the City jail) does not contain any indication that Turner: (a) threatened suicide, (b) indicated that he was suicidal, or (c) engaged in any other behavior to cause Shackelford to write that Turner was suicidal.

Finally, it is undisputed that: (a) none of the EPD officers had ever received any training regarding mental health and suicidal risk assessment, (b) no suicidal risk assessment of Turner was conducted by any EPD officers at any time, (c) Turner was out of control, uncooperative, and

26

combative from the time officers arrived at the scene outside the Turner home until some point after Turner was placed in the detox cell, and (d) Turner refused to answer medical history/assessment questions while in the processing room.  Although some of these facts may demonstrate that the Defendant officers were negligent (or even grossly negligent) with respect to ascertaining Turner's mental state, even taken in a light most favorable to Plaintiff, it is unclear that any of the Defendant officers knew or subjectively perceived facts from which they inferred that Turner was suicidal.

More significantly, even if the officers did or should have subjectively perceived the facts in such a manner as to infer that Turner presented a substantial suicide risk, there is no evidence that any of the officers consciously disregarded that risk.  Again, one thing the officers indisputably knew was that, with respect to Turner, they were dealing with a person who was, in Plaintiff's words, very intoxicated and needed to be taken away by somebody.  Therefore, Turner, like many other detainees who have been hauled into the City jail, was put in the "detox cell"/"drunk tank." And, like other detainees who have been drunk and out of control, Turner was not taken to the hospital but instead was put into the cell with all of his clothing, including his belt, shoes and shoelaces, even though doing so contravened written EPD policy.  The failure to follow administrative rules (or statutory authority), however, does not constitute deliberate indifference. *See, e.g., Davis v. Scherer*, 458 U.S. 183, 194 (1984) (officials "do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision"); *Miller v. Calhoun Cty*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834) ("Deliberate indifference requires a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'"); *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) ("under § 1983, the issue is whether [the officer]

27

violated the Constitution, not whether he should be disciplined by the local police force"). Thus, the failure of Marks, McCaig, Graham and Frierson to remove Turner's belt, shoes and shoelaces – or, in the case of Frierson (and perhaps McCaig) to physically check on Turner more frequently – each as required by EPD policy, do not establish a conscious disregard of the risk of suicide by Turner.

This is not to say that it is not possible the Defendant officers should have known that Turner was suicidal, and the failure of the Defendant officers to perceive Turner as suicidal could be characterized as negligent or even grossly negligent. Likewise, it is possible that McCaig, Marks and Graham acted negligently or even grossly negligently when they put Turner in the cell with his belt and shoelaces, in violation of the EPD policy. Based on Turner's behavior , the absence of any concurrent suicidal attempt or behavior, and the statements made by Plaintiff to Frierson on the 911 call, however, even if the Defendant officers failed to act in the face of an obvious risk of which they should have known, the Court concludes their conduct does not constitute the type of culpability that rises to a level of deliberate indifference or subjects them to Section 1983 liability as it relates to Turner's suicide. *Davis*, 6 Fed.Appx. at 250 (citing *Farmer*, 511 U.S. at 837-38).

Accordingly, the Court holds that the Defendant officers are entitled to summary judgment on Plaintiff's deliberate indifference claim based on Turner's suicide.

### b.     Serious Physical Medical Needs

Plaintiff asserts that the Defendant "officers also had knowledge of Turner's other serious medical needs that were blatantly obvious such that even a lay person would deem needed immediate medical attention, as indicated by the serious injury to his hand and his inability to breathe." As it relates to the "serious injury to [Turner's] hand," Plaintiff argues that: (1) Marks and

28

Graham were present when Mark Wilson kicked Turner's hand, (2) Marks, McCaig and Graham were present in the hallway between the processing room and the detox cell when Turner asked for medical help and to be taken to the hospital, and (3) Frierson was told by Turner that his hand was hurting. Viewing the evidence produced to the Court in a light most favorable to Plaintiff, at worst, some stitches in one of Turner's fingers were broken when Mark Wilson "kicked" Turner's hand. Plaintiff has not produced any authority, and the Court is aware of none, that a bleeding finger or broken stitches constitute a serious medical need requiring immediate medical attention. Therefore, the Court concludes that Plaintiff cannot satisfy the first (objective) component of a deliberate indifference claim as it relates to the alleged injury to Turner's hand.

As it relates to Turner's breathing issues while at the City jail, there is evidence that: (1) Turner "begged" Marks, Graham and McCaig for medical help in the hallway of the City jail because he was having trouble breathing, (2) Turner begged and yelled for help for at least an hour and a half, including yelling, "I can't breathe," and (3) specifically told Frierson that he could not breathe when Frierson checked on Turner in the detox cell at approximately 4:35 a.m. For purposes of this motion, the Court shall assume that the difficulty breathing expressed by Turner constituted a serious medical need that satisfies the first (objective) component of a deliberate indifference claim. The Court finds, however, that Plaintiff cannot satisfy the second (subjective) component of a deliberate indifference claim regarding Turner's breathing issues.

Even viewing the evidence in a light most favorable to Plaintiff, there is no reason to think that any of the officers subjectively perceived facts from which he or she could draw an inference that Turner presented a substantial risk of harm as a result of his difficulty breathing. From the time the officers first came in contact with Turner about 2:30 a.m., he was very intoxicated,

29

uncooperative, combative and, at least at times, out of control.  Turner also yelled frequently and, when he was in the detox cell, was banging and yelling for an extended period of time.  Based on Turner's actions and his complaint of having trouble breathing, it would have been reasonable for any or all of the officers to attribute his complaints of breathing trouble to Turner's yelling and physical actions.  Moreover, there is no evidence that: (1) Turner's cause of death was related to his difficulty breathing, or (2) Turner suffered any injury as a result of his difficulty breathing such that a different response by the officers would have prevented that injury.

For the reasons stated above, the Court holds that Plaintiff's claims of deliberate indifference to serious physical medical needs are not viable, as a matter of law.

### c.    Conclusion

Accordingly, for the reasons set forth above, the Court concludes, as a matter of law, that Plaintiff's claims of deliberate indifference against the Defendant officers who had any contact with Turner (*i.e.*, Frierson, McCaig, Marks and Graham) must be dismissed.

### 2.    *The City and Champagne*

To state a claim against a municipality under Section §1983, Plaintiff must prove that a violation of her constitutional rights resulted from a "custom, policy, or practice" of the municipality. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978); *City of Canton,* 489 U.S. 378 (1989). Plaintiff has the burden of setting forth with particularity the existence of the offending policy or custom and linking the policy or custom to the injury alleged:

> If a City may be liable only when the injury is inflicted in the execution of City policy, the Complaint must identify the policy, connect the policy to the City itself, and show that the particular injury was incurred because of the execution of that policy. Plaintiff must, of course, prove that the injury was caused by the City policy.

*Coogan v. City of Wixom,* 820 F.2d 170, 176 (6th Cir 1987), *overruled on other grounds by Frantz v. Vill. of Bradford*, 245 F.3d 869, 874 (6th Cir. 2001). Plaintiff cannot plead a Section 1983 cause of action with conclusory language. Plaintiff must set forth the specific policy and establish the manner in which it caused the injury. *Gregory v. Shelby Cty.*, *Tenn.*, 220 F.3d 433, 442 (6th Cir. 2000); *Monell*, 436 U.S. at 692. *See also Facteau v. Unknown Officers and Agents of Clinton Twp.,* 596 F.Supp. 580, 582-83 (E.D. Mich. 1984).

In the context of prisoner medical care:

> [Plaintiff] must show: (1) a clear and persistent pattern of mishandled medical emergencies for pre-arraignment detainees; (2) notice, or constructive notice of such pattern, to the [Township]; (3) tacit approval of the deliberate indifference and failure to act amounting to an official policy of inaction; and (4) that the custom or policy of inaction was the "moving force," or direct causal link, behind the constitutional injury.

*Garretson*, 407 F.3d at 796 (citing *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996)).

A municipality has a constitutional obligation to provide medical attention to inmates with serious medical needs. A constitutional deprivation occurs, however, only where the municipality, through the implementation of its policies and procedures, is shown to be deliberately indifferent toward an inmate's health or safety. *Perez*, 466 F.3d at 430 (citing *Gray v. City of Detroit*, 399 F.3d 612, 616-18 (6th Cir. 2005)); *Graham v. Cty. of Washtenaw*, 358 F.3d 377 (6th Cir. 2004).

> The [City] has "a duty ... to recognize, or at least not to ignore, obvious risks of suicide that are foreseeable," and to take reasonable steps to prevent an inmate's suicide "[w]here such a risk is clear." *Gray*, 399 F.3d at 618. However, "[d]eliberate indifference remains distinct from mere negligence. Where a city does create reasonable policies, but negligently administers them, there is no deliberate indifference and therefore no § 1983 liaibility." *Gray*, 399 f.3d at 618 n.1 (6th Cir. 2005).

*Perez*, 466 F.3d at 430.

31

In this case, written EPD policy provided that detainees were "to be stripped of any item which might be used by the inmate as a weapon or to harm himself, such as a necktie, shoelace, belt, etc." Plaintiff does not challenge the foregoing written EPD policy–and, had the Defendant officers followed that policy on September 26, 2010, Plaintiff could not have hung himself by his shoelace. Plaintiff instead contends that the "City violated Turner's due process rights through enacting customs deliberately indifferent to the serious medical needs of suicidal or seriously injured jailhouse detainees, where the customs allow for detainees to be placed in cells with their belt and shoelaces, unsupervised for up to an hour, regardless of their suicidal tendencies or other serious medical needs." Plaintiff argues that the EPD's recognized practice (a practice ratified by Champagne even though it contravened written EPD policy) of: (1) placing an out of control prisoner in a cell for a "cool down period," (2) without assessment of suicide risk or inquiry into serious medical needs and with belts and shoelaces, constitutes a "custom" that demonstrates deliberate indifference to the serious medical needs of EPD detainees.

     *a.*    *Psychological/Suicidal Risk*

Even assuming Plaintiff is correct that the EPD has a custom or practice of putting detainees in the detox cell, without supervision for up to an hour and without stripping them of belts and shoelaces, regardless of their suicidal tendencies or other serious medical needs, the Court finds that Plaintiff cannot recover on her claim against the City, as a matter of law, with respect to the psychological/suicidal risk allegations or the hand injury/breathing allegations. Simply put, Plaintiff cannot satisfy the elements of the Sixth Circuit *vis a vis* deliberate indifference to prisoner medical care set forth in *Garretson* and *Claiborne*, *supra*. Specifically, Plaintiff has presented no evidence:

   (a)      Of any prior instances where the EPD or its officers denied medical treatment of any kind to a prisoner;

   (b)      That the EPD or its officers had ever ignored a detainee or treated with deliberate indifference any detainee whom officers were told was a suicide risk or the officers knew was suicidal or had any other serious medical need; or

   (c)      Of a clear and persistent pattern of any treatment that could demonstrate a policy of inaction by the City *vis a vis* medical care for its prisoners with serious medical needs or suicidal ideations.

In addition, the Court notes that the established case law in the Sixth Circuit is that prisoners do not have a right to be correctly screened for suicidal tendencies, *Danese,* 875 F.2d at 1244, and that "the generalized right of a prisoner to be free from deliberate indifference [to a known serious medical need] cannot support a finding that there was a clearly established right to be protected from committing suicide." *Rich*, 955 F.2d at 1096-97.  Based on the absence of prior incidents involving the EPD and these two cases, the Court cannot find that the City needed to have a policy that required the screening of detainees for psychological/suicidal risk.

Accordingly, the Court concludes that the City and Champagne are entitled to summary judgment on Plaintiff's claim regarding the EPD's (the City's) custom or practice of utilizing the cool down period for prisoners who are out of control.

**D.**    **Failure To Train**

In *City of Canton*, the Supreme Court set forth the standard for municipal liability under a failure to train theory as follows:

> We hold today that inadequacy of police training may serve as the basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. This rule is most consistent with our admonition

33

> in *Monell* [*supra*] . . . that a municipality can be liable under §1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a City "policy or custom" that is actionable under §1983.

*Id.* at 388. The Supreme Court further stated that in determining the municipality's liability, the focus must be on the adequacy of the training program itself and not on whether a particular officer was adequately trained. The mere fact that a particular officer may be inadequately trained is not sufficient to demonstrate liability, as the officer's shortcomings could be caused by his own ineptitude or negligent administration of the program. *Id.* at 391.

Therefore, in order to hold a municipality liable under §1983 for failure to train, the Plaintiff must show that: (1) the training program is inadequate to the task the officer must perform; (2) the inadequacy is the result of the municipality's deliberate indifference; and (3) the inadequacy is "closely related to" or "actually caused" the Plaintiff's injury. *Plinton v. Cty. of Summit,* 540 F.3d 459, 464 (6th Cir. 2008); *Ellis v. Cleveland Municipal Sch. Dist.,* 455 F.3d 690, 700 (6th Cir. 2006); *Matthews v. Jones*, 35 F.3d. 1046, 1049 (6th Cir. 1994); *Hill v. McIntyre*, 884 F.2d. 271, 275 (6th Cir. 1989). To establish deliberate indifference, the plaintiff "must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Plinton,* 540 F.3d at 464 (emphasis added). A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train claims. *Bd. of Cty. Comm'rs. v. Brown*, 520 U.S. 397, 409 (1997).

34

Plaintiff argues that the City violated Turner's due process rights because, "due to the City's deliberate indifference, its officers and sergeants were insufficiently trained and/or supervised to screen and document [a] detainee['s] suicide risk and remove dangerous items from detainees' possession before placing them in cells." Plaintiff relies on the Defendant officers' testimony that they did not receive training regarding mental health and assessment. Plaintiff also relies on the testimony of Champagne that, prior to September 26, 2010, there is no record of the City having assessed whether the EPD officers had read and understood the City policies.

Plaintiff's argument fails for several reasons. First, the Sixth Circuit has recognized for over a decade that inmates have no general right to be correctly screened for suicidal tendencies, nor a generalized right to be protected against committing suicide. *See Danese,* 875 F.2d at 144; *Davis,* 6 Fed.Appx. at 26. Second, as set forth above, Plaintiff has offered no evidence of <u>any</u> similar constitutional violation(s) by EPD officers (to say nothing of a <u>pattern</u> of such constitutional violations), generally, or more specifically, no evidence of <u>any</u> similar constitutional violations by any of the officers named as Defendants in this case as it relates to serious medical needs of EPD detainees or suicidal EPD detainees. *See Plinton*, 540 F.3d at 464; *Brown*, 520 U.S. at 409. Third, Plaintiff has offered no evidence of any prior instances of suicide or suicide attempts in the City jail (at least as presented to the Court in this action), such that the City should have been on notice that its policies or customs were "deficient and likely to cause injury." *Plinton*, 540 F.3d at 464.

For the foregoing reasons, the Court finds that there is no evidence to support a finding that: (a) the City was on notice of a need to train its officers regarding detainees with a serious medical need and/or detainees claiming to be suicidal, (b) there was a pattern of constitutional violations by untrained officers, or (c) the City's alleged failure to train caused Plaintiff's claimed injuries.

35

Therefore, the Court finds that, even if the EPD officers were inadequately trained, there is no evidence that any such inadequacy was the result of deliberate indifference by the City.

Accordingly, the Court holds that the City cannot be subject to municipal liability for failing to have a different policy with regard to prisoners with a serious medical need or who claim to be suicidal, as there simply was no evidence putting the City on notice of such a need, nor any case law requiring such a policy. *Ford v. Cty. of Grand Traverse,* 535 F.3d 483, 498 (6th Cir. 2008) (citing *Garettson,* 407 F.3d at 796 (concluding that the plaintiff's municipal-liability claim failed because there was no evidence that the city had either "a custom of denying medical treatment" to inmates or "notice of a clear and persistent pattern of such treatment")); *Miller v. Calhoun Cty.,* 408 F.3d 803, 815-16 (6th Cir. 2005).

For all of the reasons above, the Court holds that the City and Champagne are entitled to summary judgment on Plaintiff's failure to train claim.

E.      **Supervisory Liability of McCaig and Frierson**

Plaintiff appears to argue McCaig and Frierson should be liable for unconstitutional supervision: (1) for the "force used by Marks in the hallway" of the City jail "that was unconstitutional," and (2) because no one took "Turner to the hospital despite their knowledge of his suicidal tendencies, the fact that while he was in the City jail, when he begged for medical attention and couldn't breathe." *Citing Campbell v. City of Springsboro, Ohio*, 700 F.3d 779, 789-90 (6th Cir. 2012). As the Court concluded above, there was no constitutional violation with respect to the underlying conduct cited by Plaintiff in parts (1) and (2) of the preceding sentence. As such, McCaig and Frierson cannot be liable under a supervisory liability theory. *See Watkins v. City of Battle Creek,* 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation …, the

36

[governmental] defendants cannot be held liable under § 1983") (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986)).

Accordingly, the Court holds that McCaig and Frierson are entitled to summary judgment on Plaintiff's claims of supervisory liability.

**F.      Motion to Extend/Dismiss**

Defendants filed their Motion to Extend/Dismiss, a motion centered on discovery matters, 3 ½ months after the discovery cut-off deadline and nearly three months after filing their Motion for Summary Judgment on the eve of the dispositive motion cut-off date. The Court denies Defendants' Motion to Extend/Dismiss for the following reasons.

First, the untimeliness of the Motion to Extend/Dismiss was egregious. As the Court's Scheduling Order clearly provides, all discovery motions are to be filed and heard prior to the discovery cut-off deadline. As such, the Court is not persuaded by a request for extension of the discovery deadline filed over three months after the (previously extended) discovery deadline had passed, nor by a motion to compel outstanding discovery. Likewise, a motion to dismiss based on discovery issues filed almost three months after the dispositive motion cut-off is unacceptable.

Second, in their Motion to Extend/Dismiss and "brief" in support thereof,[7] Defendants: (1) cited exactly zero cases, (2) barely noted three Rules from the Federal Rules of Civil Procedure (Rules 16, 26 and 37), and (3) offered little analysis of how such Rules applied to the "facts" set

---

[7]Defendants' "brief" was literally one sentence. Defendants "argued" as follows:

> Defendants hereby rely on their Motion to Extend Discovery Motion Filing Cutoff and to Dismiss Case, Strike Witnesses and/or Compel Discovery and the Court Rules cited therein.

forth therein.  Likewise, even after Plaintiff's response brief noted the dearth of authority cited by Defendants in their Motion to Extend/Dismiss and brief in support thereof, Defendants again cited exactly zero cases, and the closest thing to authority Defendants identified in their reply brief was the following statement related to striking all experts listed by Plaintiff in this case: "Pursuant to FRE [sic] Rule 26, this should include striking any expert retained by Plaintiff or any witnesses to be used at trial to present evidence under FRE 702, FRE 703 or FRE 705."  As such, the Court does not find Defendants' "arguments" legally compelling or persuasive.

Third, based on the Court's review of Defendants' Motion to Extend/Dismiss, most of the relief requested therein has been rendered moot by the Court's rulings on Defendants' Motion for Summary Judgment.  For example, many of the witnesses and other information/materials discussed clearly pertain to Plaintiff's claims related to Turner's suicide and/or other serious medical issues, yet such witnesses and information/materials have no relevance with respect to the surviving claim of excessive force based on Marks tasing Turner in the back of the patrol car.  As such, the Court need not–and will not–address those arguments at this time.

Accordingly, for the reasons set forth above, the Court denies Defendants' Motion to Extend/Dismiss.

## V.  CONCLUSION

Accordingly, and for the reasons set forth above, IT IS HEREBY ORDERED that: (1) Defendants' Motion for Summary Judgment (Docket #38) is GRANTED IN PART and DENIED IN PART, and (2) Defendants' Motion to Extend/Dismiss (Docket #50) is DENIED.

IT IS SO ORDERED.

                                        S/Lawrence P. Zatkoff
                                        LAWRENCE P. ZATKOFF
                                        UNITED STATES DISTRICT JUDGE


Dated: March 27, 2014